**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| XENOPHON STRATEGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JERNIGAN COPELAND & ANDERSON, PLLC,<br><br>Defendant. | Civil Action No. 15-1774 (RBW) |

**MEMORANDUM OPINION**

The plaintiff, Xenophon Strategies, Inc., brought this civil action in the Superior Court of the District of Columbia against the defendant, Jernigan Copeland & Anderson, PLLC, alleging a breach of contract claim based on the defendant's failure to compensate the plaintiff for the performance of the contract. See Petition for Removal ("Removal Pet.") at 1; Removal Pet., Complaint ("Compl.") ¶ 1. The defendant then removed the case to this Court pursuant to 28 U.S.C. § 1441(a) (2012). See Removal Pet. at 1. Currently before the Court is Defendant Jernigan Copeland & Anderson PLLC's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("Def.'s Mot.").[1] Defendant's Motion to Dismiss ("Def.'s Mot."). Upon careful

[1] There is also a Consent Motion to Vacate Entry of Default ("Consent Mot. to Vacate Default") pending before the Court. Because the plaintiff does not object to that motion, the Court will grant the motion, as well as the relief requested therein, and that motion will not be the subject of this Opinion.

consideration of the parties' submissions,[2] the Court concludes that it must deny the defendant's motion for the reasons that follow.

## I. BACKGROUND

The plaintiff is a "strategic communications firm," that was "organized under the laws of the Commonwealth of Virginia" and "specializ[es] in public and media relations, public affairs, crisis communication, advertising and advocacy, and government affairs." Removal Pet., Compl. ¶ 2. The plaintiff's "principal place of business is . . . [in] Washington, D.C.,"[3] id., and the defendant is a law firm "organized under the laws of . . . Mississippi," with its "principal place of business . . . [also in] Mississippi," id. ¶ 3.

In December 2014, the defendant contracted with the plaintiff for "a variety of public and media relations services in support of a lawsuit that the [defendant] intended to file in . . . Mississippi."[4] Id. ¶ 11; see also Def.'s Mem. at 2 (the plaintiff was "to perform some focused public relations work in Mississippi and nationally in connection with a prospective lawsuit then being contemplated by . . . Mississippi"); Removal Pet., Compl., Exhibit ("Ex.") 1 (December 1, 2014 Contract ("Contract")) ¶¶ 1.1-1.2 (defining the scope of services). The plaintiff "generated the [contract at issue] from its office[] in [the District of Columbia] . . . on October 20, 2014," and then it was "subsequently counter-signed . . . on December 1, 2014[,] from . . . Mississippi"

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Defendant Jernigan Copeland & Anderson PLLC's Memorandum of Law in Support of Its Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("Def.'s Mem."); (2) the Memorandum of Points and Authorities in Opposition to [the] Defendant's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("Pl.'s Opp'n"); and (3) Defendant Jernigan Copeland & Anderson PLLC's Reply Memorandum in Support of Its Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("Def.'s Reply").

[3] Hereinafter, the Court will refer to Washington, DC as the "District of Columbia," the "District," or "D.C."

[4] The contract called for a $30,000 monthly retainer in return for the plaintiff's services, as well as reimbursement for out-of-pocket expenses, all of which would be billed to the defendant in monthly invoices. See Removal Pet., Compl., Exhibit ("Ex.") 1 (December 1, 2014 Contract ("Contract")) ¶¶ 4.1-5.1.

by the defendant. Def.'s Mem., Ex. A (Affidavit of Arthur Jernigan in Support of Defendant Jernigan Copeland's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("First Jernigan Aff.")) ¶ 6. The contract came into existence because

> the Mississippi State Auditor's office (the "Auditor") [had earlier] retained [the defendant] to pursue potential claims against a group of nationally-recognized plaintiff[s'] attorneys located in Mississippi and elsewhere . . . . The . . . [a]ttorneys previously had represented the State in litigation against a number of large tobacco companies to recover funds on behalf of the State for Medicaid expenses caused by smoking. The State's case against the tobacco companies ultimately settled, and the . . . [a]ttorneys negotiated to have their legal fees in the tobacco litigation paid to them directly by the tobacco companies. The State contend[ed] that the amounts paid to the . . . [a]ttorneys are public funds that should have been paid to the State, not directly to the . . . [a]ttorneys. The State retained [the defendant] to pursue recovery of these funds in litigation . . . .
>
> After retaining [the defendant] to pursue . . . [the recovery of the funds that had been paid to the attorneys], the Auditor became concerned about the public relations fallout of pursuing the case against the . . . [a]ttorneys, particularly given their broad public recognition. In that regard, an advisor to the Auditor recommended retaining the plaintiff . . . . [The defendant] then contacted [the] [p]laintiff, on behalf of the State, regarding the potential retention of [the] [p]laintiff to perform certain public relations services related to the . . . [recovery effort].

Id. ¶¶ 4-5. In connection with the plaintiff's contractual obligations, the plaintiff and the defendant met "on more than one occasion in Mississippi . . . ." Id. ¶ 8. They never met in the District of Columbia, and the defendant never traveled to this jurisdiction in connection with the contract. Id. And aside from in-person meetings in Mississippi, "[a]ll other business between [the defendant] and the [p]laintiff was transacted by phone and email." Id.

In July 2015, the defendant "provided notice that it was terminating the [contract] pursuant to its terms," id. ¶ 9; see also Removal Pet., Compl. ¶ 13, and in September 2015, the contract was terminated, see Def.'s Mem., Ex. A (First Jernigan Aff.) ¶ 11; see also Removal Pet., Compl. ¶ 13. To date, the defendant has not paid any of the invoices billed by the plaintiff. See Removal Pet., Compl. ¶¶ 18-19; see also Def.'s Mem., Ex. A (First Jernigan Aff.) ¶ 10

("[The defendant]'s retention agreement with [Mississippi] provides that expenses associated with the . . . [the defendant's recovery efforts], including the fees and costs associated with [the] [p]laintiff's services, would be fronted by [the defendant] and other law firms [also] representing the State in the . . . [recovery efforts]. These expenses [were later] to be reimbursed to [the defendant] and the other law firms from amounts recovered by the State . . . . [The defendant] agreed to retain [the] [p]laintiff on this basis [i.e.,] based on [the defendant's] good faith reliance on representations by the Auditor that the . . . [recovery effort] would proceed expeditiously against the [p]laintiff[s'] [a]ttorneys. To date, however, the Auditor has not permitted the . . . [recovery effort] to proceed, effectively leaving [the defendant] holding the bill for amounts incurred on the State's behalf, including [the] [p]laintiff's fees and expenses. In addition, the other Mississippi-based law firms that have a contractual obligation to contribute with [the defendant] to expenses fronted on the State's behalf have not done so with respect to [the] [p]laintiff's fees and expenses.").

## II. STANDARD OF REVIEW

When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), a plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant. Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990); see also First Chi. Int'l v. United Exch. Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("[A] plaintiff must make a prima facie showing of the pertinent jurisdictional facts." (citations omitted)). Conclusory statements do not satisfy this burden. See GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343, 1349 (D.C. Cir. 2000) (citing First Chicago, 836 F.2d at 1378-79). Instead, there must be specific allegations connecting the defendant to the forum. See, e.g., Second Amendment Found. v. U.S. Conference of

Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001). Because the court is permitted to "consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction," Artis v. Greenspan, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) (citing Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)), those allegations may be "bolstered by . . . affidavits and other written materials as [the plaintiff] can otherwise obtain," Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005). And although the court need not accept the plaintiff's allegations bearing upon personal jurisdiction as true, e.g., Alkanani v. Aegis Def. Servs., LLC, 976 F. Supp. 2d 13, 22 (D.D.C. 2014), appeal dismissed, No. 14-7056, 2014 WL 4628907 (D.C. Cir. Aug. 11, 2014), "factual discrepancies appearing in the record must be resolved in favor of the plaintiff," Crane, 894 F.2d at 456 (citation omitted).

## III. ANALYSIS

Under the District of Columbia long-arm statute, a court "may exercise personal jurisdiction over a person . . . [when] a claim for relief aris[es] from the . . . [non-resident defendant's] . . . transacting . . . [of] business in the District of Columbia."[5] D.C. Code § 13-423(a)(1) (2001). The District of Columbia Circuit has interpreted this provision of the long-arm statute "to provide jurisdiction to the full extent allowed by the Due Process Clause" of the United States Constitution, and so "the statutory and constitutional jurisdiction questions . . . merge into a single inquiry," that is, whether the court's exercise of jurisdiction over the non-resident defendant satisfies "the demands of due process." Thompson Hine, LLP v. Taieb, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (citing United States v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995)). Jurisdiction over a non-resident defendant will satisfy due process if

> there are "minimum contacts" between the [non-resident] defendant and the forum, "such that he should reasonably anticipate being haled into court there." Such

[5] This provision of the long-arm statute is the only basis the defendant has pleaded for the Court's exercise of personal jurisdiction over the defendant. See Removal Pet., Compl. ¶¶ 4-5.

> minimum contacts must show that [this] defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

Thompson Hine, 734 F.3d at 1189 (first quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); then quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); and then quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

In moving to dismiss for lack of personal jurisdiction, the defendant relies heavily upon Thompson Hine and Health Communications, Inc. v. Mariner Corp., 860 F.2d 460 (D.C. Cir. 1988), see Def.'s Mem. at 7-14; yet both cases are distinguishable once the facts of each case are scrutinized and compared to those before the Court. In Thompson Hine, a Florida resident signed a retainer agreement with an Ohio-based law firm that had an office in the District of Columbia, for the firm's services in a matter in Oregon. See 734 F.3d at 1188, 1191. The Circuit concluded that the engagement of the law firm fell "short of establishing the requisite 'minimum contacts' with the District," id. at 1192, notwithstanding the fact that the firm had "performed work for [the Florida resident] in the District," id. at 1194. In reaching this conclusion, the Circuit found that: (1) the retainer agreement was "signed outside the District" and only "pertain[ed] to a matter in Oregon"; (2) "nothing in the retainer [agreement] . . . require[d] that the firm perform work or receive payment in the District"; (3) there was "no evidence of any meetings, phone calls, or emails between [the Florida resident] and the firm's [D.C.]-based lawyers concerning the Oregon matter"; (4) the retainer agreement contained no choice-of law provision; and (5) the retainer agreement was short-lived, i.e., it "lasted at most seven months." Id. at 1192. The Circuit explained that "[t]he mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the

nonresident of the benefits and protections of the District's laws." Id. at 1194 (quoting Mouzavires v. Baxter, 434 A.2d 988, 1002 (D.C. 1981)); see also id. ("A non-resident's mere retention of a [D.C.]-based service provider, absent any other deliberate contact with the forum—demonstrated either by the terms of the contract itself or by the non-resident's actual dealings with the District—cannot qualify as a 'minimum contact.'").

Similarly, in Health Communications, the Circuit also concluded that a non-resident lacked sufficient contacts with the District of Columbia for the proper exercise of personal jurisdiction. 860 F.2d at 465. There, a District of Columbia corporation was retained by a Texas corporation so that the District-based corporation could provide certain training to employees of the Texas-based corporation. Id. at 461. "The [relevant] contract was signed in Texas" and "it did not make any provision concerning either . . . parties' choice of law . . . ." Id. "In performance of this contract, and a further agreement to like effect, [the District-based corporation] held four two-day workshop sessions 'at various locations throughout the United States,' none of them in the District," where employees of the Texas-based corporation "took an examination that [the District-based corporation] graded at its office in the District . . . ." Id. Subsequently, the District-based corporation "issued certificates to those who had passed," and "also sent . . . periodic reports listing all . . . employees who had received . . . training," as well as "a quarterly newsletter and other communications, all originating from the District . . . ." Id. The Circuit explained that these contacts between the parties only reflected a "narrowly specialized" relationship, where the District-based corporation "exercise[d] indirect control" over the Texas-based corporation's contacts with the District. Id. at 463; see also id. (identifying contacts in the District as merely "quality control measures"); id. at 464 (District-based corporation's control neither extended nor affected, "much less define[d], the character of the

[Texas-based corporation]'s business"). The Circuit further explained that "a purchaser who selects an out-of-state seller's goods or services based on . . . economic merit does not thereby purposefully avail itself of the seller's state law, and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise." Id. at 465.

Here, in contrast to Thompson Hine and Health Communications, there are sufficient minimum contacts between the defendant and the District, such that the Court's exercise of personal jurisdiction would not offend traditional notions of due process, once the factual discrepancies are resolved in the plaintiff's favor. Crane, 894 F.2d at 456 (citation omitted). Under the direction of its client, the defendant contacted the District-based plaintiff for public-relations services, "in large part because of [the plaintiff]'s expertise in developing national media campaigns focused on the District of Columbia . . . ."[6] Pl.'s Opp'n, Ex. A (Declaration of David A. Fuscus ("Fuscus Decl.")) ¶ 8; see also id. ¶ 5 ("[The defendant] retained [the plaintiff] in large part because of [the plaintiff]'s relationships with national media organizations and other organizations, such as the National Chamber of Commerce and 'think tanks,' located in the District of Columbia, and its expertise in dealing with those organizations."); id. ¶ 10 ("In order to obtain coverage in the national press for a news story with public policy and political implications, it is essential to have extensive communications with people and organizations located in the District of Columbia."); id. ¶ 12 ("It is very useful to be able to have face-to-face meetings with members of the media, where possible, so being located in the District of

[6] Due to the alleged motivation underlying the defendant's retention of the plaintiff, this is not a case where the plaintiff was merely retained for its "economic merit." Thompson Hine, 734 F.3d at 1194 (no purposeful availment if services selected based on "economic merit"); see also Manifold v. Wolf Coach, Inc., 231 F. Supp. 2d 58, 62 (D.D.C. 2002) (personal jurisdiction over non-resident defendant that negotiated a contract with the plaintiff, seeking to "serve the metropolitan D.C. area").

Columbia is a significant advantage in a national media campaign. [The defendant was] aware that face-to-face meetings with reporters, producers, and others in the District of Columbia were a part of the planned national media campaign in support of the [attorneys' fees recovery efforts]."). In the course of discussing the scope and extent of these services, the plaintiff apprised the defendant of the nature of the work that would have to be performed specifically in the District. Id. ¶ 10 ("The media campaign that [the defendant] wanted [the plaintiff] to conduct literally could not have been done without extensive contacts with individuals and organizations located in the [District]—and [the defendant] made many statements that indicated that [it was] well aware of this fact. [The defendant] stated many times that . . . [the] firm really needed [the plaintiff] so that the news story about the . . . [attorneys' fees recovery efforts] would be defined in the 'national press,' which [it] knew to be centered in the District of Columbia."); see also id. ¶ 11 ("[The parties] discussed plans to try to persuade media organizations located in the District of Columbia to cover the [recovery efforts] . . . . Additionally, we discussed contacting the specialized political and policy press located in the District of Columbia . . . ."); id. ¶ 13 ("The overwhelming majority of the contacts we anticipated—and discussed with the [the defendant]—as part of the 'national' media campaign discussed in the 'Scope of Services' section of the [contract] would have been with organizations located in the District of Columbia."). For example, the contract instructs the plaintiff to engage in "[a]lly [r]ecruitment," which was described as "[p]erform[ing] outreach as necessary to groups likely to support the [defendant]'s efforts such as the [United States] Chamber of Commerce," Removal Pet., Compl., Ex. 1 (Contract) ¶ 1.1, located in Washington, D.C., Pl.'s Opp'n, Ex. A (Fuscus Decl.) ¶ 5. Knowing this, the defendant agreed to a contract, which was drafted in the District and contains a D.C. choice-of-law provision, see Thompson Hine, 734 F.3d at 1192 (choice-of-law provision

indicative of purposeful availment), with the plaintiff providing public-relations services in the District, see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985) ("Thus where the defendant 'deliberately' . . . has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (first quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 (1984); and then quoting Travelers Health Ass'n v. Va. ex rel. State Corp. Comm'n, 339 U.S. 643, 648 (1950))); see also Exponential Biotherapies, Inc. v. Houthoff Buruma N.V., 638 F. Supp. 2d 1, 7 (D.D.C. 2009) ("[A] 'substantial connection' between the contract [at issue] and the forum . . . often exists where the contract is to be performed, in whole or in part, in D.C." (emphasis added) (footnote omitted) (citing Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004))); Schwartz v. CDI Japan, Ltd., 938 F. Supp. 1, 6 (D.D.C. 1996) ("Where a non-resident [defendant] has solicited the business relationship and the contract calls for the performance of work within the District, the court may find that the transaction has such a substantial connection with the District such that the exercise of personal jurisdiction is permissible." (citations omitted)).

Moreover, after the parties agreed to the contract, the plaintiff began performing the contract as anticipated by the parties. See Pl.'s Opp'n, Ex. A (Fuscus Decl.) ¶ 22 (preliminarily contacting D.C.-based members of the media). Thereafter, the parties exchanged numerous communications with each other regarding the performance of the contract. See id. ¶¶ 15-16. Performance included "preparing" the Auditor "for a press conference to announce the filing of the [c]omplaint" associated with the attorneys' fees recovery efforts, and the Auditor "traveled to

the District of Columbia for this preparation session . . . ."[7] Id. ¶ 20. In short, the contractual relationship[8] between the parties "require[ed] continuing and wide-reaching contacts with the District of Columbia,"[9] so it cannot be said that the defendant did not reasonably anticipate being haled into courts in this forum. Ulico Cas. Co. v. Fleet Nat'l Bank, 257 F. Supp. 2d 142, 146 (D.D.C. 2003); see also Sheikh v. Mr. K's Rest., Inc., No. 04-cv-515 (RWR), 2005 WL 1387591, at *5 (D.D.C. June 10, 2005) ("In this case, plaintiff has adequately alleged that defendant intentionally established contacts with the District by retaining the plaintiff's services in the District, extensively communicating with [the] plaintiff in the District via telephone and mail, and accepting the services performed in the District by [the] plaintiff. [The] [d]efendant thereby purposefully availed itself of the privilege of conducting activities within this forum, thus invoking the benefits and protections of its laws. The [C]ourt's exercise of jurisdiction is

[7] The defendant attempts to downplay the relevance of this travel to D.C. because the Auditor is not one of the defendant's representatives. Def.'s Reply at 8 ("[The] [p]laintiff points out that [the defendant]'s client, the . . . Auditor, traveled to [the District] to prepare for an anticipated press conference in Mississippi. But even if true, this fact is entirely irrelevant, as [the] [p]laintiff is seeking to establish jurisdiction over [the defendant], not the Auditor."). But that does not render the Auditor's visit to D.C. wholly irrelevant. The defendant glosses over the allegation that the Auditor's trip to D.C. "was a critical part of the services that [the plaintiff] was contractually obligated to provide." Pl.'s Opp'n, Ex. A (Fuscus Decl.) ¶ 20. In other words, this was a contact with D.C. that resulted from the defendant's interactions with the forum. See Thompson Hine, 734 F.3d at 1194 ("deliberate contact with the forum" pursuant to "the terms of the contract" is a pertinent "minimum contact"). And the defendant did not object to the Auditor's visit to D.C.; in fact, the defendant authorized the travel. See, e.g., Removal Pet., Compl., Ex. 1 (Contract) ¶ 1.1 ("Event, interview, and spokesman preparation. Perform event, interview and spokesperson training as necessary and approved by the [defendant].").

[8] Although the contractual relationship lasted only nine months, the temporal quality of the relationship is merely one consideration in the Court's analysis. See Thompson Hine, 734 F.3d at 1192 (looking to "entire relationship" to ascertain "'continuing and wide-reaching contacts' that provided a basis for personal jurisdiction" (citing Burger King, 471 U.S. at 480)). And in any event, as explained in this Opinion, there were minimum contacts between the defendant and the District.

[9] Despite the fact that the contract specifically called for work to be performed in Mississippi, that does not negate the fact that contractually-obligated work—sufficient to be considered "minimum contacts"—would also be performed in D.C. Am. Action Network, Inc. v. Cater Am., LLC, 983 F. Supp. 2d 112, 120 (D.D.C. 2013) ("[The] [d]efendants focus heavily on the fact that much of the performance under the . . . Contract was to occur in Tampa, and that [they] primarily operated from within Florida. But the proper inquiry is whether [they] established minimum contacts with the District of Columbia, not whether their contacts with Florida were more substantial. Personal jurisdiction may lie in more than one district.").

further supported by the District's substantial interest in providing a forum within which wrongs inflicted in the District by clients who fail to pay for professional services rendered in the District can be redressed."); Kroger v. Legalbill.com LLC, No. 04-cv-2189 (ESH), 2005 WL 4908968, at *8 (D.D.C. Apr. 7, 2005) (exercising personal jurisdiction over non-resident defendant where contract called for the "carry[ing] out [of] activities in the District of Columbia" and such activities "in fact" occurred).

In an attempt to minimize the significance of any alleged contact with D.C., the defendant contends that its understanding of the scope of the "national media" as alluded to in the contract was that "it . . . [referred to] the media throughout the United States, not just the media in [D.C.]" Def.'s Reply at 4. More specifically, the defendant represents that it understood the "national media" to primarily consist of media outlets based in New York.[10] See, e.g., Def.'s Reply, Second Affidavit of Arthur Jernigan in Support of Defendant Jernigan Copeland's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction ("Second Jernigan Aff.") ¶ 6. But the defendant's contention misses the mark, especially where it also concedes that it understood that "it [was] at least possible that some (and perhaps much) of the [p]laintiff's services were [to be] performed in [D.C.]" Def.'s Mem. at 12. This concession underscores that the contract "contemplated future consequences," Thompson Hine, 734 F.3d at 1192 (quoting Burger King, 471 U.S. at 479), that would "touch[] the District in [some] way," id.

[10] Again, the parties' conflicting understanding of what constituted the "national media," as well as their clashing motives for retaining the plaintiff's public-relations services, must be resolved in the plaintiff's favor. Crane, 894 F.2d at 456 (citation omitted).

And to the extent the defendant is suggesting that a court in New York would have personal jurisdiction over the defendant because it anticipated that the plaintiff would primarily be seeking coverage through media outlets in New York, the Court notes that the defendant has not explained why it would be more burdensome to litigate this case in New York as opposed to D.C. See Koteen v. Bermuda Cablevision, Ltd., 913 F.2d 973, 975 (D.C. Cir. 1990) (finding exercise of personal jurisdiction proper and noting that such exercise was fair as the defendant was not severely burdened by having to litigate in D.C.).

(quoting Health Commc'ns, 860 F.2d at 464), and exceeds the relationship found in Health Communications that was "narrowly specialized" to a matter solely outside of the forum state, 860 F.2d at 463; see also Exponential Biotherapies, 638 F. Supp. 2d at 7 (partial performance of contract in D.C. is sufficient basis to find a substantial connection between contract and forum state). Exercise of personal jurisdiction under these circumstances, where no contacts with the District have been merely fortuitous is, therefore, constitutionally sound.[11]

## IV. CONCLUSION

To summarize, the Court concludes that the defendant purposefully availed itself of the benefits of transacting business in the District of Columbia because it allegedly pursued and contracted with the plaintiff for its public-relations services, and expected the plaintiff to provide those services—which it did—in D.C. The plaintiff has, therefore, sufficiently demonstrated the basis for this Court to exercise personal jurisdiction pursuant to D.C. Code § 13-423(a)(1).

**SO ORDERED** this 6th day of April, 2016.[12]

REGGIE B. WALTON
United States District Judge

[11] Because the Court has decided that it can exercise personal jurisdiction over the defendant, the plaintiff's request for jurisdictional discovery will be denied as moot.

[12] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.