UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
XENOPHON STRATEGIES, INC.,          )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )   Civil Action No. 15-1774  (RBW)
                                    )
JERNIGAN COPELAND & ANDERSON,       )
PLLC,                               )
                                    )
        Defendant.                  )
_____ )

## MEMORANDUM OPINION

The plaintiff, Xenophon Strategies, Inc. ("Xenophon"), brings this action against the defendant, Jernigan Copeland & Anderson, PLLC ("Jernigan Copeland"), asserting a breach of contract claim predicated on the allegation that the defendant failed to pay "the $319,858.26 that it is contractually obligated to pay" for Xenophon's performance of "all [of] its obligations under th[e] contract" between Xenophon and Jernigan Copeland. Complaint ("Compl.") ¶ 1. Currently before the Court is the Plaintiff's Motion for Summary Judgment as to Both Liability and Damages ("Pl.'s Mot."). Upon consideration of the parties' submissions,[1] the Court concludes for the reasons set forth below that the plaintiff's motion must be granted.

### I.  BACKGROUND

Jernigan Copeland, a "Mississippi law firm," Pl.'s Mem. at 6, was one of the law firms

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment as to Both Liability and Damages ("Pl.'s Mem."); (2) the plaintiff's Local Rule 7(h) Statement of Material Facts as to Which There is No Issue ("Pl.'s Facts"); (3) Defendant Jernigan Copeland's Corrected Opposition to Xenophon's Motion for Summary Judgment as to Both Liability and Damages, and Memorandum in Support ("Def.'s Opp'n."); (4) the Defendant's Local Rule 7(h) Statement of Genuine Issues Necessary to be Litigated ("Def.'s Facts"); and (5) the Reply Brief in Support of Plaintiff's Motion for Summary Judgment as to Both Liability and Damages ("Pl.'s Reply").

retained by the Mississippi State Auditor's Office in 2014 "to pursue claims against a group of nationally prominent plaintiffs' attorneys who had previously represented the State of Mississippi in litigation against . . . large tobacco companies to recover funds on behalf of the State of Mississippi for Medicaid expenses caused by smoking (the [']tobacco recovery litigation[']),'" id. at 7. However, "[t]he State of Mississippi ultimately settled this litigation and the plaintiffs' attorneys negotiated to have their attorneys['] fees in the case paid to them directly by the tobacco companies." Id. The Mississippi State Auditor's office anticipated "filing [a] complaint in the tobacco recovery litigation," id. at 8, to recoup "the amounts paid for attorneys' fees" because it believed those funds "were state funds that should have [been] paid to the State of Mississippi and not directly to the plaintiffs' attorneys." id. at 7. But, on or about May 1, 2015, the Mississippi State Auditor "decided that he would not go forward with his plans to file the lawsuit." Def.'s Opp'n at 10.

While representing the Mississippi State Auditor in the tobacco recovery litigation, the lawyers who had been retained by the state auditor, including Jernigan Copeland, "became concerned about the public relations fallout [from] pursuing the case against the plaintiffs' attorneys, . . . given their broad public recognition and the large sums of money involved." Pl.'s Mem. at 8. Thus, they "reach[ed] out to Xenophon about a possible role in helping to manag[e] the national publicity that was expected to result from the filing of the complaint in the tobacco recovery litigation." Id. After certain discussions, Xenophon, a "strategic communications firm . . . with expertise and experience in managing the public relations aspects of major national news stories," id. at 7, entered into a contract (the "Contract") with Jernigan Copeland "to provide [Jernigan Copeland] public relations and legal support services in [the] anticipated [tobacco recovery] litigation," id. at 4; see also Def.'s Opp'n, Exhibit ("Ex.") 3 (Affidavit of

2

Arthur Jernigan, Esq. in Support of Jernigan Copeland's Opposition to Xenophon's Motion for Summary Judgment as to Liability and Damages ("Jernigan Aff.")) ¶ 12 (noting that Jernigan Copeland signed the Contract on December 1, 2014); Compl., Ex. 1 (Contract dated October 20, 2014 ("Contract")).[2] This Contract is the basis for the parties' dispute.

Under the Contract, Xenophon was required "to perform discrete tasks for Jernigan Copeland as set forth in the 'Scope of Services' section [of the Contract], such as 'designing a campaign plan' or providing 'recommendations for third party research.'" Def.'s Opp'n at 6 (citing Compl., Ex. 1 (Contract) § 1.1.). In return, Xenophon "[would] be compensated with a monthly retainer of $30,000 plus expenses." Compl., Ex. 1 (Contract) § 4.1. Although "Xenophon rendered services pursuant to the Contract that were of acceptable quality," Pl.'s Facts ¶ 3; see also Def.'s Facts ¶ 3 (not disputing this fact), "Jernigan Copeland has paid nothing for the services that it received from Xenophon pursuant to the Contract," Pl.'s Facts ¶ 4; see also Def.'s Facts ¶ 4 (not disputing this fact). Having not received any compensation for the services performed, Xenophon filed this action seeking compensatory damages, pre-judgment and post-judgment interests, and attorneys' fees and costs, see Compl. at 4, and now moves for summary judgment, arguing that it "is entitled to a judgment that Jernigan Copeland breached the Contract . . . by refusing to pay for the services provided," Pl.'s Mot. at 1.

## II. STANDARD OF REVIEW

Courts will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under

---

[2] Although the parties do not cite these facts in their submissions regarding material facts that are or are not in dispute, the Court finds acknowledgment of these facts necessary, as they provide relevant context to the parties' contractual dispute. Additionally, none of these facts are contested by either party.

the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 255 (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (one ellipsis omitted) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to defeat a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III.  ANALYSIS

The parties do not dispute that Jernigan Copeland "is liable to Xenophon in at least some

4

amount" of money. Pl.'s Facts ¶ 5; see also Def.'s Facts ¶ 5 (not disputing this fact). Rather, the parties dispute whether the language of section 4.1 of the Contract regarding the compensation of fees is ambiguous. See Pl.'s Reply at 1; see also Def.'s Opp'n at 1. If the Court deems this provision of the Contract ambiguous, Jernigan Copeland then argues that there is a genuine dispute as to whether a valid contract exists between the parties, and therefore, "Xenophon is not entitled to summary judgment either as to liability or damages on the further grounds that it must demonstrate a meeting of the minds on all of the key terms of the contract." Def.'s Opp'n at 21. The Court will address these issues in turn, and because the Contract expressly provides that it "shall be governed by and construed in accordance with the laws of the District of Columbia, but excluding the conflict of laws rules thereof," Compl., Ex. 1 (Contract) § 7.4, the Court will apply District of Columbia law.

### A. The Language of Section 4.1 of the Contract

Section 4.1 of the Contract provides:

> Based on the above scope of work, Xenophon will be compensated with a monthly <u>retainer</u> of $30,000 plus expenses. Xenophon will track all hours and supply full detail to the client along with them [sic] monthly invoices. All professional fees are subject to a possible calendar year price increase not to exceed 5%.

Id., Ex. 1 (Contract) § 4.1 (emphasis added). Xenophon argues that this provision "entitle[s it] to be paid a flat fee of $30,000 per month during the term of the Contract." Pl.'s Mem. at 19; see also id. at 13 ("[T]he Contract between [the parties] provides that Xenophon will be compensated by a monthly payment of $30,000 regardless of the amount of work that is done in any particular month."). In response, "Jernigan Copeland contends that this provision requires [it] to make a $30,000 advance-fee payment each month, but that it would only be responsible for Xenophon's billable time spent providing services within the scope of the contract." Def.'s Opp'n at 1; see also id. at 6–7 ("[Jernigan Copeland] understood the Contract to establish an

5

advance-fee security retainer, whereby Jernigan Copeland would furnish a fixed monthly sum to Xenophon, and Xenophon would record its billable time, furnish these itemized bills to Jernigan [Copeland], and bill directly against the retainer.").

Under District of Columbia law, contracts "are interpreted under the 'objective law of contracts'" standard. Wharf, Inc. v. District of Columbia, 133 F. Supp. 3d 29, 40 (D.D.C. 2015) (quoting Abdelrhman v. Ackerman, 76 A.3d 883, 888 (D.C. 2013)). Accordingly,

> the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress[,] or mutual mistake.

Joyner v. Estate of Johnson, 36 A.3d 851, 855 (D.C. 2012) (first alteration in original) (quoting Dyer v. Bilaal, 983 A.2d 349, 354–55 (D.C. 2009)). Therefore,

> [i]f a [contract] is unambiguous, the court's role is limited to applying the meaning of the words . . . [,] but if it is ambiguous, the parties' intention is to be ascertained by examining the document in light of the circumstances surrounding its execution and, as a final resort, by applying rules of construction.

Wharf, Inc., 133 F. Supp. 3d at 40 (alterations in original) (quoting Joyner, 36 A.3d at 856). And, a

> contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.

Id. at 40–41 (quoting Joyner, 36 A.3d at 856). "A contract is not ambiguous simply because the parties disagree on its interpretation . . . ." Id. at 41 (quoting Clayman v. Goodman Props., Inc., 518 F.2d 1026, 1034 (D.C. Cir. 1973)); see also Aziken v. District of Columbia, 70 A.3d 213, 219 (D.C. 2013) ("'An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning[,]' and 'the court determines that proper

6

interpretation of the contract depends upon evidence outside the contract itself,' i.e., 'where its interpretation depends upon the credibility of extrinsic evidence or upon a choice of reasonable inferences from such evidence.'" (alteration in original) (first quoting Nat'l Hous. P'ship v. Mun. Capital Appreciation Partners I, LP, 935 A.2d 300, 310 (D.C. 2007), then quoting Dodek v. CF 16 Corp., 537 A.2d 1086, 1092–93 (D.C. 1988))). Moreover, "[t]he question of whether a contract is ambiguous is one of law to be determined by the court." Wharf, Inc., 133 F. Supp. 3d at 41 (alteration in original) (quoting Joyner, 36 A.3d at 856).

Here, the Court finds the language of section 4.1 of the Contract unambiguous on its face, and thus, there is "no need to impanel a jury to interpret the compensation" of the fees provision in the Contract. Duffey v. Cent. States, Se. & Sw. Areas Pension Fund, 829 F.2d 627, 630 (7th Cir. 1987). In its attempt to demonstrate ambiguity in section 4.1, Jernigan Copeland asserts that "the word 'retainer' itself is an ambiguous, technical term that is reasonably susceptible of multiple meanings." Def.'s Opp'n at 14; see also id. at 14–16 (noting that Black's Law Dictionary provides four definitions of the word "retainer," and that these four definitions "are reflected in [a] proliferation of cases . . . discussing the various meanings of the word"). While it is true that courts in this jurisdiction "have found Black's Law definitions to be helpful in construing [contracts] under District of Columbia law," Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp., 758 F.3d 378, 384 (D.C. Cir. 2014), the mere fact that a term . . . may have different dictionary definitions in different contexts, does not alone create an ambiguity." Dish Network Corp. v. Arch Specialty Ins. Co., 989 F. Supp. 2d 1137, 1144 (D. Col. 2013); cf. Rigby v. Allstate Indem. Co., 123 A.3d 592, 598–99 (Md. Ct. Spec. App. 2015) ("[S]imply because 'a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous.' Or in other words, simply because [the

7

defendant] can point to several slightly different dictionary definitions . . . does not render that term ambiguous." (quoting Allstate Ins. Co. v. Humphrey, 229 A.2d 70 (Md. 1967))); HolRail, LLC v. Surface Transp. Bd., 515 F.3d 1313, 1317 (D.C. Cir. 2008) ("[A]mbiguity is a creature not of definitional possibilities but of [contractual] context." (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994))). As Xenophon notes, see Pl.'s Reply at 2, the Court must interpret the challenged language "as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made," Carlyle Inv. Mgmt. LLC v. Ace Am. Ins. Co., 131 A.3d 886, 895 (D.C. 2016) (quoting Debnam v. Crane Co., 976 A.2d 193, 197 (D.C. 2009)). Therefore, the Court does not find convincing Jernigan Copeland's argument that section 4.1 is ambiguous simply because the word "retainer" has multiple definitions.

Jernigan Copeland also argues that "various other provisions in the [C]ontract suggest that [the word] 'retainer' [in section 4.1] was an advance deposit against which fees would be drawn," and therefore, there are other reasonable interpretations of the word "retainer" as used in the Contract that create ambiguity. Def.'s Opp'n at 17–19. First, Jernigan Copeland notes that section 4.1 "provides that Xenophon will 'track all hours and supply full detail to the client along with . . . monthly invoices.'" Id. at 17 (quoting Compl., Ex. 1 (Contract) § 4.1). In addition, Jernigan Copeland notes that "the Contract authorizes Xenophon to invoice 'for Services on a monthly basis, along with [a] six percent professional fee," id. (quoting Compl., Ex. 1 (Contract) § 5.1(a)), and that Xenophon's monthly invoices would include a "[a] detailed summary of billable time," Compl., Ex. 1 (Contract) § 5.1(a); see also id., Ex. 1 (Contract) § 4.1 ("Xenophon will track all hours and supply full detail to the client along with the[] monthly invoices."). From Jernigan Copeland's perspective, "Xenophon's interpretation of the retainer provision as a 'flat

8

fee' monthly $30,000 payment . . . would render the phrase 'the Client will be invoiced for Services' and the phrase 'a detailed summary of billable time' nullities." Def.'s Opp'n at 18 ("To assign the meaning of the Contract for which Xenophon argues—that the retainer is money that is owed as compensation to Xenophon whether or not the latter performs any work—would be to read this restriction out of the Contract." And, according to Jernigan Copeland, under Xenophon's interpretation, "there would be no reason to distinguish billable time from non-billable time, nor would there be any reason to use the phrase 'billable time' at all."). However, the Court does not find that these two phrases create any ambiguity regarding the word "retainer" as used in section 4.1 of the Contract, nor that they become nullities if the Court accepts Xenophon's interpretation of section 4.1 of the Contract as a flat fee monthly retainer. Rather, "the monthly invoices detailing [Xenophon's] fees and expenses," in conjunction with the "detailed summary of billable time," served as an accounting mechanism that generated an entitlement of actual payment to Xenophon for the work performed. See Compl., Ex. 1 (Contract) § 5.1(a) ("Invoices will be sent on or about the 1st of each month and payment is due upon receipt. The first invoice of this [C]ontract will be delivered on or about November 2, 2014 for work performed in October, 2014."). And, contrary to Jernigan Copeland's position that these two phrases show that the "'retainer' was an advance deposit against which fees [would be] drawn," Def.'s Opp'n at 17, they indicate that Xenophon would only receive payment for services performed the month immediately <u>after</u> the services were completed and upon Jernigan Copeland's receipt of the invoice, see <u>In re Caesars Entm't Operating Co., Inc.</u>, 561 B.R. 420, 436 (Bankr. N.D. Ill. 2015) ("An advance payment retainer is a payment in exchange for the commitment to provide <u>future</u> legal services." (emphasis added)). Thus, for these reasons and for the additional reasons set forth below, the Court does not find persuasive Jernigan

9

Copeland's arguments regarding these two phrases in the Contract.

Contrary to Jernigan Copeland's position, interpreting the Contract "as a whole [and] giving a reasonable, lawful, and effective meaning to all its terms," Carlyle Inv. Mgmt. LLC, 131 A.3d at 895 (quoting Debnam, 976 A.2d at 197), the Court construes section 4.1 of the Contract to unambiguously compensate Xenophon with a flat fee of $30,000 plus expenses per month throughout the life of the Contract. As Xenophon notes, the Contract did not include any language indicating that the $30,000 monthly retainer would "be billed against hours and expenses or that any unearned sums will be returned to Jernigan Copeland. Indeed, . . . it does not contain any requirement of prepayment of fees." Pl.'s Mem. at 22; see also In re Printing Dimensions, Inc., 153 B.R. 715, 723 (Bankr. D. Md. 1993) (noting that the advance fee retainer arrangement provided that "[a]dditional fees will be charged if the retainer is exhausted," that fees would be based on "time and results" and that "[f]inal fees will be based on hourly rates and results" (alterations in original)); In re Dewey & Leboeuf LLP, 493 B.R. 421, 430 (Bankr. S.D.N.Y. 2013) (noting that an "advance payment retainer is not client property[;] the client retains an interest in that portion of the [r]etainer that is not yet earned[;] . . . [and] at the conclusion of the [contract] . . . any portion of the advance payment retainer that is not earned" must be returned to the client). And, because payment for work performed in one month was due the following month upon receipt of the invoice detailing the work performed that preceding month, see Compl., Ex. 1 (Contract) § 5.1(a), the Contract did not call for prepayment or advance payment of fees.

Furthermore, in addition to the two phrases of the Contract relied upon by Jernigan Copeland in support of its position, sections 1.2 and 2.2 of the Contract support the Court's conclusion that section 4.1 was intended to compensate Xenophon a flat fee of $30,000 per

month plus expenses without any limitation based on the hours and services performed during the preceding month. First, section 1.2 provides that "[a]dditional services such as public affairs campaigns required by the client that fall outside the boundaries of the Scope of Services [as defined] herein with client approval will be charged at Xenophon's then-current[] hourly rates." Compl., Ex. 1 (Contract) § 1.2. Thus, payment for services based on Xenophon's hourly rates was only for services performed beyond those identified in the scope of services provision of the Contract as set forth in section 1.1, which, according to section 4.1, are compensated by a $30,000 monthly retainer. See Pl.'s Mem. at 13 ("The only mention of hourly rates in the Contract is in [section] 2.2 . . . There is no need to mention hourly rates in a flat fee monthly retainer compensation arrangement since Xenophon's compensation is not based on hours worked or hourly rates."); see also Compl., Ex. 1 (Contract) § 4.1 (noting that Xenophon's compensation was "[b]ased on the above scope of work" without any indication of an hourly rate). Therefore, accepting Jernigan Copeland's interpretation that section 4.1 of the Contract provides for an advance fee retainer would amount to "includ[ing] a provision in the [Contract] that is plainly not there," which this Court cannot to do. Aziken, 70 A.3d at 220 (quoting Bragdon v. Twenty-Five Twelve Assocs. LP, 856 A.2d 1165, 1170 (D.C. 2004)).

Additionally, section 2.2 states that the "[C]ontract may be terminated by either party with [sixty]-days written notice." Compl., Ex. 1 (Contract) § 2.2. As Xenophon notes, if the Court accepts Jernigan Copeland's "interpretation of the [C]ontract as a 'prepaid' retainer agreement under which Xenophon is compensated solely on the basis of hours worked, [section 2.2] would be unnecessary as [Jernigan Copeland] could order Xenophon to stop work (and thus stop receiving pay) at any time under [section] 6.1 of the [C]ontract." Pl.'s Reply at 4; see also Compl., Ex. 1 (Contract) § 6.1 (providing that Jernigan Copeland "ha[s] the right to modify or

11

stop any schedules or work in progress under this [Contract]; and in such event, Xenophon shall immediately take proper steps to carry out such [i]nstructions"). Consequently, accepting Jernigan Copeland's position, if it elected to have Xenophon not perform any services, even if only temporarily, Xenophon would "remain[] contractually required to make its staff available as needed to perform the services defined in the Contract" without compensation, Pl.'s Reply at 4, as the Contract would remain viable absent a termination notification as required by section 2.2. Therefore, accepting Jernigan Copeland's interpretation of section 4.1 as an advance payment retainer would render section 2.2 meaningless, an outcome inconsistent with the objectives courts in this jurisdiction strive to achieve. See Abdelrhman, 76 A.3d at 891 ("When interpreting a contract, we strive to give reasonable effect to all of its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole." (citation and internal quotation marks omitted)).

In sum, "the face of [section 4.1] itself . . . [and] its plain meaning," Capital City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc., 747 A.2d 564, 567 (D.C. 2000), coupled with the Court giving "effective meaning to all [the Contract's] terms," Carlyle Inv. Mgmt. LLC, 131 A.3d at 895, unambiguously provide Xenophon "with a monthly retainer of $30,000 plus expenses" as a flat fee intended to compensate Xenophon for the services performed under the Contract as defined in section 1.1.[3] Compl., Ex. 1 (Contract) § 4.1.

### B. Jernigan Copeland's Liability Under the Contract

In its motion, Xenophon argues that it is entitled to summary judgment with respect to

---

[3] Having concluded that the challenged language in section 4.1 of the Contract is unambiguous, the Court need not consider the parties' arguments regarding the credibility of extrinsic evidence, see Wharf, Inc., 133 F. Supp. 3d at 40 (noting that "[i]f a [contract] is unambiguous, the court's role is limited to applying the meaning of the words" (alterations in original) (quoting Joyner, 36 A.3d at 856)), or Jernigan Copeland's argument that there is a genuine dispute regarding whether a valid contract exists if section 4.1 is found to be ambiguous, see Def.'s Opp'n at 21–23.

liability because "[t]here can be no doubt that Jernigan Copeland is liable under the Contract to reimburse Xenophon for the services rendered and expenses incurred pursuant to the Contract." Pl.'s Mem. at 18. Again, the Court agrees with Xenophon.

As Xenophon notes, "[i]t is undisputed that there was a [valid] contract between Xenophon and Jernigan Copeland, that Xenophon rendered services pursuant to the Contract that were of acceptable quality, and that Jernigan Copeland has paid nothing for the services that it received." Id. at 18–19; see also Pl.'s Facts ¶¶ 2–4; Def.'s Facts ¶¶ 2–4. Also, as previously mentioned, "Jernigan Copeland has expressly conceded that it is liable to Xenophon in at least some amount." Pl.'s Mem. at 19; see also Pl.'s Facts ¶ 5; Def.'s Facts ¶ 5. Accordingly, because Jernigan Copeland disputes only the amount it is obligated to pay Xenophon under the Contract, see Def.'s Facts ¶ 6 ("There is a genuine issue as to whether Xenophon is entitled to be paid for periods that it performed no work under the Contract, as the Contract authorizes invoices for 'Services,' which facially requires Xenophon to furnish Services in order to be paid."), the Court must grant Xenophon summary judgment with respect to Jernigan Copeland's liability for its breach of the Contract.[4]

### C. Damages Jernigan Copeland is Obligated to Pay Xenophon

Having concluded that Jernigan Copeland is liable for breaching the Contract by failing to pay for any of the services Xenophon rendered pursuant to the Contract, the Court must now determine the amount of damages Xenophon is entitled to recover as a result of Jernigan Copeland's breach. Xenophon argues that it is entitled to damages in the amount of $314,456.37

---

[4] In its opposition, Jernigan Copeland states that it had "entered into a fee- and cost- sharing agreement with" other lawyers retained by the Mississippi State Auditor's office for the tobacco recovery litigation and that under that agreement, it "had no responsibility to pay any of the litigation expenses, including the expenses incurred in the course of its relationship with Xenophon." Def.'s Opp'n at 4. However, as Jernigan Copeland acknowledges, it alone "entered into the [C]ontract with Xenophon," id., and therefore is solely liable under the Contract.

13

in fees and expenses accumulated throughout the duration of the Contract. See Pl.'s Mem. at 22–23. Again, the Court agrees with Xenophon.

The Contract provides that Xenophon's performance "beg[a]n on October 20, 2014[,] and will be on-going," Compl., Ex. 1 (Contract) § 2.1, until the Contract was "terminated by either party with [sixty]-days written notice," id., Ex. 1 (Contract) § 2.2. Jernigan Copeland did not provide "written notice of termination of the Contract [until] July 8, 2015." Pl.'s Mem. at 22–23; see also Def.'s Opp'n, Ex. 7 (E-mail exchange between Jernigan Copeland and Xenophon dated July 8, 2015, regarding written termination notice). Accordingly, based on the dates of these events, Xenophon is entitled to the $314,456.37 in fees and expenses as outlined in its final invoice to Jernigan Copeland. See Compl., Ex. 3 (Xenophon's Final Invoice and Statement of Charges dated August 11, 2015) (listing its monthly fees and expenses as well as late fee charges applied due to unpaid balances).[5]

Nonetheless, Jernigan Copeland contends that it is not liable to pay Xenophon's fees and expenses after May 1, 2015, when it "communicated [to Xenophon the Mississippi State Auditor's] decision [not to go forward with the tobacco recovery litigation] . . . and instructed [Xenophon] to cease work under the Contract." Def.'s Opp'n at 10; see also id. at 11 ("[Xenophon] had already ceased working under the [C]ontract, and had already transitioned [its] staff off of the [t]obacco [r]ecovery [l]itigation matter."). However, the clear language of the Contract required a two-month written notice to terminate a party's obligations under the Contract. See Compl., Ex. 1 (Contract) § 2.2. And, although Jernigan Copeland, as a signatory to the Contract, should have been fully aware of this contractual requirement, Xenophon made

---

[5] In making this calculation, the Court did not include the finance charges amounting to $5,401.89 listed on the final invoice and statement, as that amount appears to be late fee charges applied for Jernigan Copeland's failure to pay outstanding balances, which under the Contract would be part of any pre-judgment interest award that the Court will address later in its opinion. See Compl., Ex. 1 (Contract) § 5.2.

efforts to advise Jernigan Copeland to terminate the contract sooner rather than later given the Mississippi State Auditor's decision, see Pl.'s Mem. at 15 (citing four e-mails Xenophon sent to Jernigan Copeland advising Jernigan Copeland to consider canceling the contract given its financial interest), some of which Jernigan Copeland acknowledged it "overlooked . . . [due to] an honest oversight," Def.'s Opp'n, Ex. 3 (Jernigan Aff.) ¶ 30. Moreover, while Jernigan Copeland's actual dispute concerns its position that Xenophon may not have actually logged any hours or performed any work on the tobacco recovery litigation matter after being instructed to cease work on May 1, 2015, the Court has already concluded that the Contract did not call for Xenophon to be compensated on an hourly basis, but rather with a monthly flat fee for services performed pursuant to the "scope of services" provision of the Contract, Compl., Ex. 1 (Contract) § 1.1; see supra Part III.A. In any event, as Xenophon notes, "until the expiration of the [C]ontract ([sixty] days after written notice of termination), Xenophon remained contractually required to make its staff available as needed to perform the services defined in the Contract. Certainly, a requirement to have staff available as needed constitutes 'services' for which compensation is required." Pl.'s Reply at 4. Therefore, the Court concludes that Xenophon is entitled to $314,456.37 as the compensation Jernigan Copeland agreed to pay during the life of the Contract.

Xenophon also asserts that "pre-judgment interest is due on the unpaid amounts due under the Contract at the rate of 5% compounded monthly." Pl.'s Mem. at 23 (noting that "under [section] 5.2 of the Contract, [it] is entitled to receive interest at its own rate of borrowing on any sums remaining unpaid for more than 30 days after an invoice is received"). Xenophon calculates the pre-judgment interest as of the date when it filed its Complaint as $20,397.86. See id. at 23 n.16. Jernigan Copeland fails to address Xenophon's argument that it is entitled to a

15

pre-judgment interest award at a rate of 5% compounded monthly on unpaid amounts, and therefore, the Court will treat this argument as conceded. See, e.g., Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (Walton, J.) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citations omitted)), aff'd 98 F. App'x 8 (D.C. Cir. 2004). In any event, because the Contract expressly authorizes Xenophon "to impose an interest charge equal to its own borrowing rate for any invoice payment outstanding more than [thirty] days," Compl., Ex. 1 (Contract) § 5.2, and because "[t]he decision on whether to award prejudgment interest falls within this Court's discretion," Finks v. Life Ins. Co. of N. Am., No. 08-1272 (ESH), 2009 WL 1473939, at *1 (D.D.C. May 27, 2009), the Court concludes that a pre-judgment interest award is appropriate.[6]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must grant Xenophon's motion for summary judgment as to both liability and damages.

**SO ORDERED** this 1st day of August, 2017.[7]

REGGIE B. WALTON<br>
United States District Judge

---

[6] Because Xenophon is seeking pre-judgment interest until the date judgment is entered, see Pl.'s Mem. at 23 n.16, the Court will require Xenophon to file on the docket an additional affidavit calculating the amount of pre-judgment interest due as of the date of this judgment. Additionally, in its Complaint, Xenophon requests that the Court award it "post-judgment interest" as well as "reasonable attorneys' fees and costs." Compl. at 4. Although not referenced in its motion for summary judgment, to the extent that Xenophon is also seeking awards of post-judgment interest and attorneys' fees and costs, Xenophon, in conjunction with its filing related to an award of pre-judgment interest, may seek awards for post-judgment interest and attorneys' fees and costs, provided that the requisite documentation demonstrating its entitlement to such awards is presented.

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.